IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

EMMANUEL O. SOYOOLA,

        Plaintiff,

v.                              CIVIL ACTION NO.   2:13-cv-08907

OCEANUS INSURANCE COMPANY, et al.,

        Defendants.

**ORDER**

Pending before the court is Emmanuel O. Soyoola's Motion for Leave to File Amended Complaint [Docket 33]. This motion is ripe for review. For the reasons stated below, the motion [Docket 33] is **GRANTED in part and DENIED in part.**

**I.      Background**

This case arises out of an insurance coverage dispute between Oceanus Insurance Company ("Oceanus"), the insurer, and Dr. Emmanuel O. Soyoola, the insured. Oceanus contends the Liability Risk Retention Act of 1986 preempts Dr. Soyoola's state law claims. Dr. Soyoola responds that his claims are not preempted. However, even if his claims fall within the scope of the Liability Risk Retention Act, Dr. Soyoola argues they fall within its exceptions.

**A.   Factual Background**

Dr. Soyoola is a citizen of Georgia. (Compl. [Docket 1-2], ¶ 1). He practiced as an obstetrician and gynecologist in Logan County, West Virginia. (*Id.* ¶ 2). Oceanus is a risk retention insurance group.[1] Oceanus is chartered in South Carolina, where it issued Dr. Soyoola a "claims

---

[1] A risk retention group is a liability insurer that is owned by its insureds or "members". *See* 15 U.S.C. 3901(a)(4). Members of a risk retention group must be in the same industry and share similar risk exposure. *See id.*

made"[2] medical malpractice insurance policy ("the Policy"). (*Id.* ¶¶ 8-9). The Policy covered claims arising from Dr. Soyoola's practice in West Virginia. (*Id.* ¶ 9). The Policy had a limit of $1 million per claim. (*Id.*). In August 2009, Oceanus declined to renew the Policy. (*Id.* ¶ 10). Instead, Oceanus issued Dr. Soyoola tail coverage for $250,000 ("the Tail Policy"). (*Id.* ¶ 13). According to Dr. Soyoola, Oceanus failed to offer him $1 million in tail coverage, with amortized premiums, as required by West Virginia Code § 33-20D-3(a). (*See id.* ¶ 10). In addition, Oceanus did not tell Dr. Soyoola that if he took less than $1 million in tail coverage, he could not benefit from West Virginia's statutory caps on non-economic damages. (*Id.* ¶ 12).

### B. Procedural Background

Currently, Dr. Soyoola is being sued for medical malpractice ("McNeely action"). (*Id.* ¶ 15). After Oceanus received notice of the action, it provided defense to Dr. Soyoola. (*Id.*). However, Oceanus told Dr. Soyoola that he only had $250,000 in coverage for the claim. (*Id.*). Dr. Soyoola requested that Oceanus agree to resolve the claim against Dr. Soyoola. (*Id.* ¶ 17). However, Oceanus refused a $1 million settlement offer from the plaintiff. (*Id.*).

Due to Oceanus's alleged failure to comply with West Virginia law, Dr. Soyoola sued Oceanus in West Virginia state court. (*See generally id.*). Dr. Soyoola alleged three claims against Oceanus: (1) breach of contract arising from Oceanus's failure to comply with West Virginia Code § 33-20D-3; (2) declaratory judgment for the full amount required under West Virginia Code § 33-20D-3; and (3) misleading representations under the Unfair Trade Practices Act, West Virginia Code § 33-11-1. (*Id.* ¶¶ 20-28).

---

[2] A "claims made" policy "means a policy which covers claims which are reported during the policy period, meet the provisions specified by the policy, and are for an incident which occurred during the policy period, or occurred prior to the policy period, as specified by the policy." W. Va. Code § 33-20D-2(b).

In the instant motion, Dr. Soyoola seeks to add several factual allegations in his proposed complaint. First, the proposed complaint states that, before the Policy expired, Dr. Soyoola notified Oceanus of an occurrence, which resulted in the McNeely action. (Am. Compl. [Docket 33-2], ¶¶ 10-11). Second, the proposed complaint alleges Oceanus was an unauthorized insurer when it issued the Policy to Dr. Soyoola in August 2004. (*Id.* ¶ 6). Finally, the proposed complaint asserts that Oceanus's license application, registration, and other sworn statements indicated that Oceanus agreed to comply with all applicable West Virginia insurance laws. (*Id.* ¶¶ 13-15). In addition to the factual allegations, the proposed complaint alleges three additional counts: Count IV (false or deceptive practices), Count V (fraud), and Count VI (punitive damages). (*Id.* ¶¶ 27-54). The complaint also alleges a breach of contract claim arising from Oceanus's failure to provide coverage for the McNeely action under the Policy. (*Id.* ¶ 19).

## II.    Legal Standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that, after time for amendment as a matter of course has passed, leave of court must be obtained to amend a pleading. The rule provides that a court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "The law is well settled that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile. . . . Delay alone is an insufficient reason to deny leave to amend. Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (internal citations and quotation marks omitted). An amendment is futile if it would fail to survive a motion to dismiss. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

3

### III.    Discussion

The determinative issue in this case is whether the Liability Risk Retention Act ("LRRA") preempts Dr. Soyoola's claims arising from Oceanus's violation of West Virginia Code § 33-20D-3. For the reasons stated below, I **FIND** the LRRA preempts § 33-20D-3. Claims premised on a violation of § 33-20D-3 must fail because this statute is inapplicable to Oceanus. Therefore, I deny amendment to add those claims. However, I **FIND** the LRRA does not preempt Dr. Soyoola's breach of contract, fraud, and false and deceptive practices claims arising under the Policy. I permit amendment to add those claims.

### A.  Federal Preemption Law

Federal preemption originates from the Constitution's Supremacy Clause. *See* U.S. Const. art. VI, cl. 2.[3] In addressing a preemption issue, the court's first task is to determine whether Congress intended to preempt. *See California Fed. Savings & Loan Ass'n*, 479 U.S. 272, 281 (1978). Intent to preempt can manifest itself in three forms: field preemption, express preemption, and conflict preemption. *See H&R Block E. Enters.*, *v. Raskin*, 591 F.3d 718, 722 (4th Cir. 2010). Field preemption occurs when the "federal scheme of regulation of a defined field is so pervasive that Congress must have intended to leave no room for the states to supplement it[.]" *City of Charleston, S.C., v. A Fisherman's Best Inc.*, 310 F.3d 155, 169 (4th Cir. 2002). Express preemption arises when "Congress expressly declares its intent to preempt state law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005). Finally, conflict preemption occurs when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)

---

[3] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

(internal quotation marks omitted). Conflict preemption can also arise when "compliance with both federal and state regulations is a physical impossibility[.]" *Id.*

Once Congress's intent to preempt is determined, the focus turns to the scope of that preemption. *See Duvall v. Bristol-Myers-Squibb Co.*, 103 F.3d 324, 328 (4th Cir. 1996). Two presumptions guide this inquiry. *See id.* First, "'the purpose of Congress is the ultimate touchstone' in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Second, a court starts "with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "This presumption is strongest when Congress legislates 'in a field which the States have traditionally occupied.'" *S. Blasting Servs., Inc. v. Wilkes Cnty., N.C.*, 288 F.3d 584, 590 (4th Cir. 2002) (quoting *Medtronic, Inc.*, 518 U.S. at 485).

Insurance is one of those traditional areas. *See generally FMC Corp. v. Holliday*, 498 U.S. 52, 53 (1990). To preserve states' traditional authority in this area, Congress enacted the McCarran-Ferguson Act, which states that a federal law must explicitly indicate it is preempting state insurance law. *See* 15 U.S.C. § 1012 ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act *specifically relates to the business of insurance* . . . ." (emphasis added)). For a state insurance law to be valid despite a relevant federal scheme, "(1) the state law in question must be enacted for the purpose of regulating the business of insurance; (2) the federal law must not be specifically related to the business of insurance; and (3) the federal law must invalidate, impair or supersede the state law in

question." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 230-31 (4th Cir. 2004).

### B.  The Liability Risk Retention Act of 1986

In 1981, to address rising premiums for products liability insurance, Congress enacted the Products Liability Risk Retention Act ("PLRRA"). H.R. Rep. 97-190, at 4, *reprinted in* 1981 U.S.C.C.A.N. 1432, 1432 (hereinafter "H.R. Rep. 97-190"). In passing this legislation, Congress recognized that risk retention groups allowed "product manufacturers to purchase insurance on a group basis at more favorable rates or to self-insure through insurance cooperatives called 'risk retention groups.'" *Id.*

However, risk retention groups faced difficulties in providing insurance nationwide. Normally, an insurer must obtain a license and comply with the regulations of every state it seeks to do business. *See* Vonda Mallicoat Laughlin, *State Laws Restricting the Operation of Risk Retention Groups-Necessary Protection or Illegal Regulation?*, 60 Drake L. Rev. 67, 68 (2011). *See generally* Baird Webel, Cong. Research Serv., RL 32176, *The Risk Retention Acts: Background and Issues* 2 (2003). This could mean complying with a myriad of state regulations to provide insurance nationwide. *See generally* Webel, *supra*, at 2.

Under the PLRRA, as long as it complied with the regulation of its chartering state, a risk retention group could provide products liability insurance nationwide, without submitting to the regulation of non-chartering states. *Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1075 (9th Cir. 2000). Thus, the objective of the PLRRA was to promote "the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state

statutes that, in the aggregate, thwart the interstate operation [of] . . . product liability risk retention

groups." *Id.* (quoting H.R. Rep. No. 97-190, at 12).

In 1986, Congress enacted the LRRA, amending the PLRRA. *See* Pub. L. 99-563, 100 Stat.

3170 (codified as amended at 15 U.S.C. § 3901-06). The LRRA extended the protections of the

PLRRA to all types of insurance offered by risk retention groups, not just products liability

insurance. *Mears Transp. Grp. v. Florida*, 34 F.3d 1013, 1017 (11th Cir. 1994). However, in

response to the increased scope of the LRRA, Congress also created certain exemptions to the

law—areas in which the states could regulate non-resident risk retention groups. The statute

provides in relevant part:

> Except as provided in this section, a risk retention group is exempt from any
> State law, rule, regulation, or order to the extent that such law, rule, regulation, or
> order would—
> (1) make unlawful, or regulate, directly or indirectly, the operation of a risk
> retention group *except* that the jurisdiction in which it is chartered may regulate the
> formation and operation of such a group and *any State* may require such a group
> to—
> (A) comply with the *unfair claim settlement practices law of the State*;
>
> . . .
>
> (G) comply with any State law regarding *deceptive, false, or fraudulent acts
> or practices*, except that if the State seeks an injunction regarding the
> conduct described in this subparagraph, such injunction must be obtained
> from a court of competent jurisdiction . . . .

15 U.S.C. §§ 3902(a)(1)(A), (G) (emphasis added).

In sum, the LRRA creates a "tripartite scheme." *Nat'l Home Ins. Co. v. State Corp.

Comm'n of Com. of Va.*, 838 F. Supp. 1104, 1110 (E.D. Va. 1993). The LRRA creates the federal

framework in which chartering and non-chartering states may regulate risk retention groups. *Id.*

Under the LRRA, a risk retention group is primarily governed by its chartering state's regulations.

*Id.* "Only the chartering jurisdiction may directly regulate the formation and every day operations of a risk retention group." *Id.* A non-chartering state may regulate a risk retention group, but only in several discrete areas as identified by the LRRA. *See id.* at 1111.

### C. Analysis of the Preemption Issues

#### i. The Liability Risk Retention Act Expressly Preempts Most State Insurance Laws Regulating Risk Retention Groups

Congress expressly declared its intent to preempt state insurance laws regulating risk retention groups. Section 3902(a)(1) clearly states that the LRRA preempts any state law or regulation that would "make unlawful, or *regulate, directly or indirectly, the operation of a risk retention group*[.]" 15 U.S.C. § 3902(a)(1) (emphasis added). The legislative history of the LRRA further confirms this conclusion. The very purpose of the LRRA was to allow risk retention groups to operate nationwide under the regulation of one jurisdiction, rather than fifty-one jurisdictions. *See* H.R. Rep. No. 97-190, at 12; *Attorneys' Liab. Assurance Soc'y, Inc. v. Fitzgerald*, 174 F. Supp. 2d 619, 635 (W.D. Mich. 2001) ("However, the LRRA was designed not only to prevent discriminatory treatment of non-resident risk retention groups, but also to preempt regulation of risk retention groups by states other than the chartering state." (citations omitted)); *see also* Webel, *supra*, at 5.

While the Fourth Circuit has not addressed whether the LRRA explicitly preempts state insurance laws, other circuits examining the LRRA's framework and history conclude that the LRRA preempts most state insurance laws. *See Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1077 (9th Cir. 2000) ("Even with a general presumption that insurance law should ordinarily be regulated under state law, as reinforced by the McCarran-Ferguson Act, the language and

8

purpose of the LRRA clearly indicate an intent to preempt state laws regulating [risk retention groups]."); *Ophthalmic Mut. Ins. Co v. Musser*, 143 F.3d 1062, 1067 (7th Cir. 1998) ("Congress specifically preempted some state insurance regulation—namely those state laws regulating [risk retention groups]—with the enactment of the PLRRA and the LRRA."); *Preferred Physicians Mut. Risk Retention Grp. v. Pataki*, 85 F.3d 913, 914 (2d Cir. 1996) ("[T]he LRRA partially preempts state regulation of [risk retention groups] and prohibits states from excluding [risk retention groups] chartered under the laws of another state."); *Cf. State of Fla., Dep't of Ins. v. Nat'l Amusement Purchasing Grp., Inc.*, 905 F.2d 361, 363-64 (11th Cir. 1990) (In contrast to purchasing groups, "Congress carefully crafted a scheme [for risk retention groups], which, on the one hand, provides for broad preemption of a non-domiciliary state's licensing and regulatory laws but which, on the other hand, explicitly preserves for those states several very important powers."). Accordingly, I **FIND** the LRRA expressly preempts most state insurance laws.

### ii. The Scope of the LRRA is Expansive

Having found Congress expressly declared its intent to preempt most state laws regulating non-resident risk retention groups, I now turn to the scope of that preemption. The above-described legislative history indicates that the LRRA broadly preempts state laws regulating non-resident risk retention groups. H.R. Rep. No. 99-865, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5303, 5312 (hereinafter "H.R. Rep. No. 99-865") ("The format of Section 3 of the Act [listing limited exceptions to its preemption provisions] is to confirm the broad authority of the chartering State regarding the formation and operation of risk retention groups . . . .").

Also, courts reviewing the LRRA's statutory framework have concluded that the LRRA's preemptive provisions are expansive. *See Alliance of Nonprofits for Ins., Risk Retention Grp. v.*

9

*Kipper*, 712 F.3d 1316, 1318-19 (9th Cir. 2013) ("The [LRRA] broadly preempts 'any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would . . . make unlawful, or regulate, directly or indirectly, the operation of a risk retention group.'" (quoting 15 U.S.C. § 3902(a)(1)); *Preferred Physicians Mut. Risk Retention Grp. v. Pataki*, 85 F.3d 913, 915 (2d Cir. 1996) ("We agree with the district court that the LRRA's preemption language is expansive. . . . This expansiveness is emphasized by the structure of the Act, which sets forth a broad preemption followed by certain limited exceptions." (internal citations omitted));; *Nat'l Home Ins. Co. v. State Corp. Comm'n of Com. of Va.*, 838 F. Supp. 1104, 1109 (E.D. Va. 1993) ("[T]he Act's structure and language make clear that '[t]he express preemption of state law with respect to risk retention groups is expansive.'" (quoting *City Cab Co. v. Edwards*, 745 F. Supp. 757, 761 (D. Me. 1990)); *Cf. Nat'l Amusement Purchasing Grp., Inc.*, 905 F.2d 361, 364 (11th Cir. 1990) ("Unlike the risk retention section which broadly preempts state law while enumerating specific laws that states may enforce, the section pertaining to purchasing groups expressly preempts a limited number of specific state laws . . . .").

In addition, the presumption against preemption does not apply here. For such a presumption to arise, "the federal law *must not be specifically related to the business of insurance*[.]" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 230-31 (4th Cir. 2004). Because the LRRA specifically declares its intent to preempt certain state insurance regulation, the LRRA meets the specificity requirements of the McCarran-Ferguson Act. *See, e.g.*, *Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1077 (9th Cir. 2000); *Ophthalmic Mut. Ins. Co v. Musser*, 143 F.3d 1062, 1067 (7th Cir. 1998). Accordingly, I **FIND** the LRRA's preemption provisions are expansive.

10

### iii.   The LRRA Preempts West Virginia Code § 33-20D-3

West Virginia Code § 33-20D-3 provides that a medical malpractice insurer must, "[u]pon cancellation, nonrenewal or termination of any claims made professional malpractice insurance policy . . . offer to the insured tail insurance coverage." *Id.* § 33-20D-3(a). In addition, the insurer must offer its insured "the opportunity to amortize the payment of premiums for tail insurance over a period of not more than thirty-six months, in quarterly payments." *Id.* § 33-20D-3(b).

By its terms, § 33-20D-3 is meant to regulate insurers. This statute, if applied to Oceanus, would force it to provide tail insurance and certain financing options, and thus directly regulates its operation. Therefore, § 33-20D-3 fits within the scope of LRRA preemption. Because § 33-20D-3 does not fall under one of LRRA's exceptions to preemption, federal law preempts it. *See* 15 U.S.C. §§ 3902(a)(1)(A)-(I) (risk retention group exceptions) and 3905 (financial responsibility exception); *see also Nat'l Warranty Ins. Co.*, 214 F.3d at 1079-80 (summarizing exceptions). As a result, the regulatory laws of South Carolina, where Oceanus is chartered, in combination with federal law, apply to Oceanus. Accordingly, I **FIND** § 33-20D-3 is inapplicable to Oceanus.

### D.  Analysis of Dr. Soyoola's Amendments

Having addressed the initial preemption issues, I will now examine the merits of Dr. Soyoola's amendments. As previously discussed, Dr. Soyoola is seeking to add three additional counts: fraud, false and deceptive practices, and punitive damages. He also seeks to revise his breach of contract count to add a claim arising under the Policy. As result of the analysis that follows, only Dr. Soyoola's claims for fraud, false and deceptive practices, breach of contract, and punitive damages arising under the Policy remain.

### i.  Breach of Contract Arising Under the Policy

While the LRRA preempts state *insurance* laws that regulate risk retention groups, it does not preempt generally applicable areas of law, such as the law of contracts. *See generally* H.R. Rep. 99-865, at 14-15 ("As an insurance company operating under this Act, a risk retention group could engage in a range of activities, but the Committee wished to be clear that the scope of the exemption is defined by the laws governing the [insurance] business. It would not extend, for example, to the laws of nonchartering states which establish regulatory regimes for businesses and industries other than insurance."). Basic contract law applies to all individuals or businesses that contract in West Virginia.

To recover under a breach of contract theory, the plaintiff must prove: "the existence of a valid, enforceable contract, that the plaintiff has performed under the contract, that the defendant has breached or violated its duties or obligations under the contract, and that the plaintiff has been injured as a result." *Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 714 (S.D. W. Va. 2009). Here, Dr. Soyoola asserts that the Policy, a contract of insurance, existed between him and Oceanus. He also alleges that Oceanus breached its duties under the contract by failing to provide him coverage under the Policy for the McNeely action. Finally, he claims that because of the breach he has suffered "direct, monetary damages." (Am. Compl. [Docket 33-2], ¶ 20). Therefore, I **FIND** that Dr. Soyoola's claim for breach of contract arising from the Policy would survive a motion to dismiss. Accordingly, I **GRANT** Dr. Soyoola's amendment with respect to the breach of contract claim arising out of the Policy.

### ii.   False and Deceptive Practices

Under the LRRA, a non-chartering state may require a risk retention group to comply with its laws "regarding deceptive, false, or fraudulent acts or practices . . . ." 15 U.S.C. § 3902(a)(1)(G). Similar to Dr. Soyoola's claim for unfair trade practices in his original complaint, Dr. Soyoola's claim for false or deceptive practices arises under West Virginia's Unfair Trade Practices Act ("UTPA"), West Virginia Code § 33-11-1.[4] Because Dr. Soyoola's deceptive practices claim falls under an exception to the LRRA, this claim is not preempted. *See Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1079 (9th Cir. 2000).

The UTPA regulates insurance trade practices by defining and prohibiting unfair or deceptive practices. W. Va. Code § 33–11–1. The UTPA states that "[n]o person shall engage in this State in any trade practice which is defined in this article as . . . an unfair or deceptive act or practice in the business of insurance." *Id.* § 33–11–3. The Supreme Court of Appeals of West Virginia has held that the UTPA creates a private cause of action against insurance companies who violate the Act. *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 901 (W. Va. 1998) ("This Court has held that there is an implied private cause of action for a violation by an insurance company of the unfair settlement practice provisions of W. Va. Code § 33-11-4(9).").

---

[4] Dr. Soyoola's claim for unfair trade practices and false and deceptive practices are essentially the same claim of relief. For his unfair trade practices claim, Dr. Soyoola cites West Virginia Code § 33-11-1, which states "[t]he purpose of this article is to regulate trade practices in the business of insurance . . . by defining . . . all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."

To state a claim for relief, a plaintiff must show the defendant engaged in unfair, false, and deceptive practices as defined by West Virginia Code § 33-11-4(9). The allegations in the count for unfair trade practices closely track the deceptive practices listed in § 33-11-4(9). In his count for false and deceptive practices, Dr. Soyoola alleges that Oceanus repeatedly violated § 33-11-4(9). Because relief under both counts is predicated on a violation of § 33-11-4(9), they are the same claim. However, "a party may set out 2 or more statements of a claim or defense." Fed. R. Civ. P. 8(d)(2).

To state a claim under UTPA, the plaintiff must show that the insurer repeatedly violated §
33-11-4(9). Syl. Pt. 4, *Dodrill v. Nationwide Mut. Ins. Co.*, 491 S.E.2d 1 (W. Va. 1996). Violations
may occur in the handling of multiple claims or a single claim. *See id.* Here, Dr. Soyoola alleges
Oceanus repeatedly violated § 33-11-4 of the Act, which defines prohibited unfair and deceptive
practices. Specifically, the proposed complaint asserts Oceanus acted in bad faith by (1) failing to
acknowledge coverage for the medical malpractice claim under the Policy, (2) failing to confirm
$1 million in tail coverage, and (3) forcing Dr. Soyoola to file the instant action to obtain benefits
under the Policy and the tail coverage he should have received. The proposed complaint further
alleges that these violations were wrongful and repeated. Although Dr. Soyoola cites § 31-11-4, he
does not cite the specific subsections Oceanus repeatedly violated.

Concerning the claim arising under the Policy, Dr. Soyoola's allegations likely fall under
the following subsections:

> (d) refusing to pay claims without conducting a reasonable investigation
> based upon all available information;
> . . .
>
> (f) Not attempting in good faith to effectuate prompt, fair and equitable
> settlements of claims in which liability has become reasonably clear; [and]
> . . .
>
> (n) failing to promptly provide a reasonable explanation of the basis in the
> insurance policy in relation to the facts or applicable law for denial of a
> claim or for the offer of a compromise settlement."

W. Va. Code § 33-11-4(d), (f), and (n). If Dr. Soyoola timely made a demand for coverage under
the Policy, Oceanus's repeated and alleged failure to compensate Dr. Soyoola, without proper
cause, would constitute a violation of the above-cited subsections. Accordingly, I **GRANT** the

14

plaintiff's addition of the count of false and deceptive practices with respect to bad faith claims arising under the Policy.

However, I **FIND** the count for false and deceptive practices with respect to tail coverage would not survive a motion to dismiss. Dr. Soyoola alleges that Oceanus acted in bad faith by failing to confirm $1 million in tail coverage. Dr. Soyoola alleges that Oceanus was required to provide such coverage under West Virginia Code § 33-20D-3(a). As previously mentioned, § 33-20D-3(a) is preempted by the LRRA. Because Oceanus did not have to comply with § 33-20D-3(a), it cannot be said that it acted in bad faith by failing to confirm the $1 million in tail coverage. Accordingly, I **DENY** the plaintiff's motion to add the false and deceptive practices count with respect to tail coverage.

### iii. Fraud

Fraud, like contract law, is a generally applicable area of tort law and thus not preempted by the LRRA. Dr. Soyoola characterizes his fraud claim in three ways: (1) that Oceanus told him that he had "no coverage under the Policy for the McNeely claim and actions," even though Oceanus knew the tail coverage would insufficient to cover the claims, (2) that Oceanus failed to inform him of the adverse consequences of taking less than $1 million in tail coverage, and (3) that Oceanus misrepresented his tail coverage options by failing to offer him the right to amortize his premiums as required by West Virginia Code § 33-20D-3(a). (*See* Am. Compl. [Docket 33-2], ¶ 38).

Oceanus argues Dr. Soyoola's fraud claims are futile under the "gist of the action" doctrine. Under the gist of the action doctrine, "[a]n action in tort will not arise for breach of contract unless the action in tort would arise independent of the existence of the contract." Syl. Pt.

9, *Lockhart v. Airco Heating & Cooling, Inc.*, 567 S.E.2d 619 (W. Va. 2002). In other words, "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013) (per curiam) (citing *Goldstein v. Elk Lighting, Inc.*, No. 3:12–CV–168, 2013 WL 790765, at *3 (M.D. Pa. 2013)). This doctrine will bar an action in tort, such as fraud, if a party establishes any of the following:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Id.* (quoting *Star v. Rosenthal*, 884 F. Supp. 2d 319, 328–29 (E.D. Pa. 2012)). In his response, Dr. Soyoola focuses on the preemption issues and does not address Oceanus's gist of the action argument.

The gist of the action doctrine does not bar Dr. Soyoola's first allegation against Oceanus. An exception to the gist of the action doctrine is fraud based "on expression[s] of intention" if a party lacks such intent "to fulfill the promise at the time it was made . . . ." *Croston v. Emax Oil Co.*, 464 S.E.2d 728, 732 (W. Va. 1995). In his factual background section, Dr. Soyoola states that "Oceanus wrongfully did not intend to provide Dr. Soyoola with any defense or indemnity under the Policy for any of the potential claims reported by Dr. Soyoola before the effective date of the cancellation, non-renewal, or termination of the Policy, including the McNeely claim . . . ." (Am. Compl. [Docket 33-2], ¶ 11). Construing the facts in a light favorable to Dr. Soyoola, he states a viable claim for fraud. Accordingly, I **GRANT** amendment with respect to the fraud claim arising out of the Policy.

16

In addition, the gist of the action doctrine does not bar Dr. Soyoola's other allegations. Whether Oceanus had a duty to provide the option of amortization does not arise under any contractual obligations, but rather under the statutory obligation imposed by West Virginia Code § 33-20B-3. In addition, whether Oceanus had a duty to inform Dr. Soyoola of the tort law consequences of selecting less than $1 million is not dependent on the contractual relationship between the parties. However, this duty may arise if Dr. Soyoola demonstrates there was a special relationship between him and Oceanus. Accordingly, I will also consider the merits of Dr. Soyoola's latter two allegations.

The proposed complaint alleges that Oceanus fraudulently misrepresented the tail coverage options available to Dr. Soyoola. If Dr. Soyoola had been aware of his rights under § 33-20B-3, Dr. Soyoola claims he would have accepted the $1 million limit with amortization. To recover for fraudulent misrepresentation, Dr. Soyoola must show: "(1) [t]hat the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and *false*; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." *Horton v. Tyree*, 139 S.E. 737, 738 (W. Va. 1937) (emphasis added). "The plaintiff does not need to prove that the defendant actually knew the representations were false if the defendant was in a position to know, and had a duty to know, whether the representations were true or false." *Wolford v. Children's Home Soc'y*, 17 F. Supp. 2d 577, 584 (S.D. W. Va. 1998).

As previously mentioned, Oceanus was not obligated to provide tail coverage under § 33-20B-3. Therefore, Oceanus's representation of available tail coverage, which did not include amortization, was not false. If the statement was not false, Oceanus did not make a representation

17

known to be false or without knowledge of its falsity. I **FIND** that Dr. Soyoola cannot meet all of the elements of fraud with regard to the misrepresentations of available tail coverage and amortization. Accordingly, I **DENY** the amendment with respect to misrepresentations arising under § 33-20B-3.

In addition, the proposed complaint alleges Oceanus misrepresented to Dr. Soyoola that failure to elect $1 million in tail coverage would disqualify him from West Virginia's non-economic damages cap.[5] Because of this misrepresentation, Dr. Soyoola elected the $250,000 tail coverage limit, thus exposing himself to unlimited non-economic damages in the McNeely action.

Fraud may arise from an omission as well as an intentional misrepresentation. *Id.* "Fraud is the concealment of truth just as much as it is the utterance of a falsehood." *Frazer v. Brewer*, 310 43 S.E. 110, 111 (W. Va. 1902). "Fraudulent concealment involves concealment of facts by one with knowledge, or the means of knowledge, and *a duty to disclose*, coupled with an intention to mislead or defraud." *Livingston v. K-Mart Corp.*, 32 F. Supp. 2d 369, 374 (S.D. W. Va. 1998) (Haden, J.).

Dr. Soyoola does not cite, nor can I find, any West Virginia authority obligating Oceanus to explain to Dr. Soyoola the tort law consequences of electing certain coverage levels. However, noting the absence of West Virginia law on an insurer's duty to advise, this court observed that "[m]any courts have recognized the general rule that 'absent special circumstances, an insurer or

---

[5]  In 2003, the West Virginia legislature lowered the cap on non-economic damages from $1,000,000 to $500,000 or $250,000, depending on the nature of the action. H.B. 2122, Regular Session (2003). The statute also states that
> The limitations on noneconomic damages . . . are not available to any defendant in an action pursuant to this article which does not have medical professional liability insurance in the amount of at least one million dollars per occurrence covering the medical injury which is the subject of the action.

W. Va. Code § 55-7B-8(d).

its agent has no duty to advise an insured as to the insured's insurance coverage needs.'" *Hill,*

*Peterson, Carper, Bee & Deitzler, P.L.L.C. v. XL Specialty Ins. Co.*, 261 F. Supp. 2d 546, 548

(S.D.W. Va. 2003) (quoting Gary Knapp, Annotation, *Liability of insurer or agent of insurer for*

*failure to advise insured as to coverage needs*, 88 A.L.R.4th 249, § 3, 1991 WL 741640 (1991)).

The Indiana Court of Appeals has described the factors that could give rise to an insurer's duty to

advise:

> At a minimum, the insurer and insured must be engaged in a long-term relationship
> for the purpose of securing insurance coverage. . . . [H]owever, *Cook* clearly
> instructs it is the *nature* of the relationship, and not merely the numbers of years
> associated therewith, that triggers the duty to advise. Some factors relevant to
> developing entrustment between the insurer and the insured include: exercising
> broad discretion to service the insured's needs; counseling the insured concerning
> specialized insurance coverage; holding oneself out as a highly-skilled insurance
> expert, coupled with the insured's reliance upon the expertise; and receiving
> compensation, above the customary premium paid, for expert advice provided.

*Parker by Parker v. State Farm Mut. Auto. Ins. Co.*, 630 N.E.2d 567, 569-70 (Ind. Ct. App. 1994).

In the proposed complaint, Dr. Soyoola alleges that Oceanus was his insurer for five years,

that Oceanus knew about the adverse consequences of selecting less than $1 million in tail

coverage, and that he relied on the information provided by Oceanus in selecting the limit for the

tail coverage. Dr. Soyoola does not allege that Oceanus had exercised "broad discretion" in

helping Dr. Soyoola select a policy, had held itself out as an expert in insurance, or received extra

compensation in providing advice to Dr. Soyoola regarding available coverage options. On

balance, Dr. Soyoola has failed to allege facts suggesting Oceanus had a duty to advise under these

circumstances.

In addition, this duty to disclose does not arise out of some fiduciary relationship between

Oceanus and its insureds, as Dr. Soyoola is essentially arguing. Under West Virginia law, a

19

fiduciary duty is "'[a] duty to act for someone else's benefit, while subordinating personal interests to that of the other person. It is the highest standard of duty implied by law [.]'" *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 900 (W. Va. 1998) (quoting *Black's Law Dictionary* 625 (6th ed. 1990)). The Supreme Court of Appeals of West Virginia "has never recognized that the relationship between an insurer and its insured is in the nature of a fiduciary relationship." *Id.* The Supreme Court of Appeals has yet to find the insurer/insured relationship obligates the insurer to subordinate its interests to that of its insureds during policy negotiations. Nor has the court found that an insurer must not only explain the policy's provisions and exclusions, but also explain the interplay between tort law and the insured's election of coverage. Accordingly, I **DENY** Dr. Soyoola's amendment with respect to Oceanus's legal omission.

### iv.  Punitive Damages

Dr. Soyoola also adds a count for punitive damages. As discussed above, Dr. Soyoola's surviving claims are breach of contract, fraud, and fraudulent and deceptive practices arising under the Policy. With respect to the breach of contract claim, "punitive damages are not available for ordinary breach of contract actions." *Casto v. Nw. Mut. Life Ins. Co.*, No. 2:09-CV-00377, 2009 WL 2915132, at *3 (S.D. W. Va. Sept. 2, 2009).

However, Dr. Soyoola can obtain punitive damages under two theories. First, Dr. Soyoola can recover punitive damages under tort theory. *See* Syl. Pt. 1, *Smith v. Perry*, 359 S.E.2d 624, 625 (W. Va. 1987). Punitive damages are available in tort actions where there is "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear[.]" *Id.* Here, Dr. Soyoola alleges that Oceanus's fraudulent intentions regarding the Policy were "reckless, willful, wanton, and/or intentional" and caused him

to "suffer direct, monetary damages and the potential for financial devastation." (Am. Compl. [Docket 33-2], ¶¶ 46-47). Construing the allegations in his favor, Dr. Soyoola would be entitled to an award of punitive damages for Oceanus's fraudulent conduct.

Second, punitive damages are also available under the UTPA. *See Pen Coal Corp. v. William H. McGee & Co.*, 903 F. Supp. 980, 989 (S.D. W. Va. 1995); Syl. Pt. 3, *Poling v. Motorists Mutual Ins. Co.*, 450 S.E.2d 635 (W. Va. 1994) An insurer may be liable for refusal to pay a claim if it "actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally utilized an unfair business practice in settling, or failing to settle, the insured's claim." *McCormick v. Allstate Ins. Co.*, 475 S.E.2d 454, 458 (W. Va. 1998).

In his proposed complaint, Dr. Soyoola alleges that he informed Oceanus of the McNeely occurrence before Oceanus cancelled the Policy. Dr. Soyoola claims Oceanus repeatedly violated West Virginia Code § 33-11-4(9), including failing to promptly settle claims when coverage was reasonably clear. Dr. Soyoola alleges that although Oceanus "knew or should have known that Dr. Soyoola's claim for demand for coverage was proper," Oceanus failed to "confirm coverage for the McNeely Plaintiff's demand to settle the claim." (Am. Compl. [Docket 33-2], ¶ 35). Dr. Soyoola further alleges that such conduct was "willful, wanton, malicious, and intentional . . . ." *Id.* Therefore, I **FIND** Dr. Soyoola has alleged sufficient facts for his punitive damages count to survive a motion to dismiss. Accordingly, I **GRANT** Dr. Soyoola's amendment for punitive damages with respect to the fraud and fraudulent and deceptive practices claims arising under the Policy.

**IV.     Conclusion**

For the reasons stated above, Dr. Soyoola's motion to amend [Docket 33] is **GRANTED in part** with respect to the breach of contract, fraud, false and deceptive practices, and punitive damages claims arising under the Policy, but **DENIED in part** with respect to the fraud, false and deceptive practices, and punitive damages claims arising under the Tail Policy. The court **DIRECTS** the plaintiff to file his amended complaint within 14 days of the date of this Order.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.   The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          December 11, 2013

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE